# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

TRUSTED TRANSPORTATION
SOLUTIONS, LLC,

        Plaintiff,

    v.

GUARANTEE INSURANCE COMPANY,
et al.,

        Defendants.

1:16-cv-7094-NLH-JS

**OPINION**

---

**APPEARANCES:**
WILLIAM B. IGOE
CASEY GENE WATKINS
WILLIAM J. DESANTIS
BALLARD SPAHR LLP
210 LAKE DRIVE EAST
SUITE 200
CHERRY HILL, NJ 08002

    *On behalf of Plaintiff*

CHRISTINA M. RIEKER
LARRY C. GREEN, JR.
ANDREW N. JANOF
WINGET, SPADAFORA & SCHWARTZENBERG LLP
2500 PLAZA 5
HARBORSIDE FINANCIAL CENTER
JERSEY CITY, NEW JERSEY 07311

    *On behalf of Defendants*

**HILLMAN**, District Judge,

In this matter that concerns claims of broker malpractice, pending before the Court are Defendants' Motion for Summary Judgment (Docket Item 138) and Plaintiff's Cross-Motion for

Summary Judgment (Docket Item 147).  For the reasons expressed below, both parties' motions will be denied because genuine issues of material facts exist.

## BACKGROUND[1]

In this action, Plaintiff Trusted Transportation Solutions ("Plaintiff") alleges that Defendants Brown & Brown of New Jersey ("Brown & Brown") and John F. Corbett ("Corbett" and collectively "Defendants") misrepresented the terms of a workers' compensation insurance policy that Plaintiff purchased through Defendants.  (See generally Docket Item 38.[2])

Plaintiff is a temporary staffing service solely owned by Brian Davis that provides truck drivers and warehouse personnel

---

[1] The Court distills this undisputed version of events from the parties' statements of material facts, affidavits, and exhibits, and recounts them in the manner most favorable to the party opposing summary judgment in each respective cross motion.  The Court disregards, as it must, those portions of the parties' statements of material facts that lack citation to relevant record evidence (unless admitted by the opponent), contain improper legal argument or conclusions, or recite factual irrelevancies. See generally L. CIV. R. 56.1(a); see also Kemly v. Werner Co., 151 F. Supp. 3d. 496, 499 n.2 (D.N.J. 2015) (disregarding portions of the parties' statements of material facts on these grounds); Jones v. Sanko Steamship Co., Ltd., 148 F. Supp. 3d 374, 379 n.9 (D.N.J. 2015) (same).

[2] The Court notes that there are two separate docket items that appear to be the operative Amended Complaint.  (See Docket Item 35; Docket Item 38.)  The Court further notes that those two Amended Complaints appear to be identical.  In the interest of clarity, the Court will cite only to Docket Item 38 when referring to the operative Amended Complaint.

to its clients.  Defendant Corbett is a licensed insurance
producer who works for Defendant Brown & Brown.  Defendant
Corbett began serving as one of Plaintiff's insurance brokers in
2010.  Guarantee Insurance Company ("Guarantee"), another
defendant in this case, was the insurance company that issued
the workers' compensation policy in question to Plaintiff in
2015.  Patriot Underwriters Inc. ("Patriot"), another defendant
in this case, had a contract with Guarantee to market and
underwrite policies issued by Guarantee.  Douglas Cook, the
final defendant in this case, was an employee of Patriot in
2015.

     From 2010 to 2014, Defendant Brown & Brown procured
guaranteed cost workers' compensation insurance from the
commercial market for Plaintiff.  However, Plaintiff's business
is considered "high risk" and "difficult to place" for workers'
compensation insurance purposes.  As a result, in 2014,
Plaintiff's commercial insurer refused to renew Plaintiff's
coverage.  Therefore, Plaintiff was forced to get insurance from
the state-run assigned risk pool, which requires higher premiums
than the commercial market.  A year later, in 2015, Plaintiff
notified Defendants that it did not want to obtain insurance
through the pool anymore.  Plaintiff's goal in finding a new
policy was "[t]o find the best insurance that makes the most

sense for" Plaintiff.  (See Docket Item 153-1 ¶ 19.)  The
parties disagree over whether Plaintiff required getting a
policy outside of the pool or merely preferred as much.  (See
Docket Item 147-4 ¶ 19; Docket Item 153-1 ¶ 19.)

In searching for a new policy, Plaintiff, via Defendants
and another broker, was unable to obtain from the commercial
market a guaranteed cost policy, which tends to be less
expensive than other policies.  Defendants were only able to
secure a proposal from Guarantee for a large deductible workers'
compensation policy, which Defendants provided to Plaintiff on
March 31, 2015.  Defendant Corbett also met in person with Davis
on March 31, 2015.  The parties dispute what occurred at this
meeting.

The first dispute relates to the how Plaintiff's premium
would be calculated under Guarantee's policy.  Davis testified
that Defendant Corbett repeatedly stated that Guarantee's
policy's premium would be based on a "universal rate" of $5.32
per $100 of payroll, regardless of how employees were
classified.  (Docket Item 153-9 at 132:11-134:8.)  Defendant
Corbett testified that he did not make any such promise, but
rather that there would be different rates based on how
different employees were classified.  (See Docket Item 138-7 at
87:14-90:20.)  Defendant Corbett merely meant for the "universal

4

rate" to be a reflection of the average rate of all of
Plaintiff's employees, based on previous years' payrolls. (See
id.) Plaintiff's payroll for the policy period totaled
$5,292,427.00, while the proposal had projected a payroll of
$5,700,000. Had the "universal rate" applied, Plaintiff would
have paid $281,557.12 in premiums during the policy period.
Instead, Plaintiff paid $343,224.00 in premiums, or $61,666.88
more than it would have had the "universal rate" applied.

Another aspect of the policy that was discussed at the
March 31, 2015 meeting was the Loss Fund. Unlike some policies,
Guarantee's policy required Plaintiff to have a deductible of
$250,000 per claim. To ensure the ability to do this, Guarantee
required Plaintiff to establish a Loss Fund in the amount of
$650,000. Patriot would administer and use the Loss Fund to pay
claims up to the deductible amount. At the meeting, Davis asked
Defendant Corbett what fees would come out of the Loss Fund.
The parties disagree over how that question was answered. Davis
testified that Defendant Corbett called Douglas Cook, a Patriot
employee, to help answer the question. (Docket Item 153-1 ¶
67.) Both Defendant Corbett and Cook denied recalling such a
call taking place. (Docket Item 153-3 at 101:6-11; Docket Item
147-8 at 94:24-95:9.) Davis alleges that Cook him, while
Defendant Corbett was listening, that the Loss Fund would be

used to pay only indemnity costs, medical expenses, and attorneys' fees. (Docket Item 153-1 ¶ 68.) Cook told Davis that the premium, and not the Loss Fund, would cover "commissions and administrative fees and things," according to Davis. (Id.) In addition to denying that the phone call ever took place, Defendant Corbett alleges that he informed Davis that claim payments would come out of the Loss Fund. (Docket Item 147-9 at 117:8-11.) As it turned out, the Loss Fund was used to pay "Allocated Loss Adjustment Expense" ("ALAE") under the policy, which included numerous administrative costs — such as the costs of bill review services[3] — beyond indemnity costs, medical expenses, and attorneys' fees. During the Guarantee policy period, Patriot paid $123,329.90 from the Loss Fund for costs beyond indemnity costs, medical expenses, and attorneys' fees.

Additionally, Plaintiff alleges that Defendant Corbett expressed to it that any unused portion of the Loss Fund would roll over to the next year if Plaintiff chose to renew its policy with Guarantee, which Plaintiff viewed as "a huge selling point." (Docket Item 153-1 ¶¶ 77-78.) Defendant Corbett

_____

[3] The policy provided a service wherein the insurer would review Plaintiff's medical bills to look for savings. Any savings that the insurer found would be returned to Plaintiff, less a 40% fee for the "bill review service."

disputes this, stating that he was merely referring to how Guarantee typically did business and that Plaintiff was aware that Guarantee could roll over the Loss Fund at its sole discretion. (Id.)

Plaintiff also claims that, in the above-mentioned phone call, Davis asked whether the Loss Fund would be kept in a self-secured (or segregated) fund and was assured that it would be. (Id. ¶¶ 80-81.) Defendants, in addition to denying that the phone call ever happened, characterize things differently. Defendant Corbett testified that Davis asked him whether he knew if the Loss Fund was held in a separate account, not if it was required to be so held. (Id. ¶ 81.) In reality, the fund was not segregated. On November 1, 2017, $45,231.39 remained in the Loss Fund. On November 27, 2017, Guarantee entered into a receivership for purposes of liquidation. In January 2018, Patriot filed for bankruptcy. Plaintiff has not recovered the remaining funds, despite the policy stating that they would be incrementally repaid beginning 18 months after the policy became effective.

Ultimately, Plaintiff agreed in writing to purchase the Guarantee policy at the March 31, 2015 meeting. The Policy became effective on April 3, 2015. Plaintiff claims that it was only after this time that it became aware of the various

discrepancies outlined above.  Defendant contends that Plaintiff
was aware of all of the actual terms of the policy based on
various documents, including a written proposal and three term
sheets from Guarantee.  (Docket Item 147-4 ¶¶ 28-66.)  Plaintiff
points out that, while it did have some of those documents
before signing up for the policy, it only signed up after
Defendants representations at the March 31, 2015 meeting.  (See
id. ¶ 28.)

     As has been outlined above, Plaintiff alleges that the
policy wound up being different in certain key aspects than what
Defendants had described.  As a result, they filed this action,
initially in state court.  It was removed to federal court on
October 13, 2016.  Defendants were not initially included in the
suit, but were added in Plaintiff's Amended Complaint, which was
filed in early May 2017.  The Amended Complaint originally
contained ten claims against Defendants.  (Docket Item 38.)
However, on June 8, 2018, the late Honorable Jerome B. Simandle
dismissed nine of those counts — seven with prejudice and two
(Counts IX and X) without prejudice.  (Docket Item 85.)
Defendants did not seek the dismissal of Count VII.  (See id.)
Plaintiff filed a Motion for Leave to File a Second Amended
Complaint on July 11, 2018, to redress the deficiencies with
Counts IX and X.  (See Docket Item 88.)  Magistrate Judge Joel

Schneider denied that Motion on September 7, 2018. (Docket Item 107.) Plaintiff filed a Motion for Reconsideration (Docket Item 111) on September 21, 2018, which Judge Schneider denied on January 14, 2019, (Docket Item 134).

Plaintiff filed an Appeal of the Magistrate Judge's denial on January 28, 2019. (Docket Item 137.) This Court denied that Appeal on September 25, 2019. (Docket Item 157.) As a result of the above procedural history, the only remaining claim against Defendants Brown & Brown and Corbett in this action is Count VII, which alleges "Negligence/Broker Malpractice." (See Docket Item 38.)

Currently before the Court are Defendants' Motion for Summary Judgment (Docket Item 138) and Plaintiff's Cross-Motion for Summary Judgment (Docket Item 147). Defendant filed its Reply Brief on April 29, 2019. (Docket Item 153.) Plaintiff filed its Reply Brief on May 13, 2019. (Docket Item 154.) Having considered the parties' filings and arguments, the Court will deny both Defendants' Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment for the reasons expressed herein.

## DISCUSSION

### A. Subject Matter Jurisdiction

The Court has jurisdiction over Plaintiff's claims under 18

U.S.C. § 1332, as the requirements of diversity are met.[4]

**B.   Standard for Motion for Summary Judgment**

Summary judgment is appropriate where the Court is
satisfied that "'the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits if any,' . . . demonstrate the absence of a genuine
issue of material fact" and that the moving party is entitled to
judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S.
317, 322-23 (1986) (quoting FED. R. CIV. P. 56).

An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the nonmoving
party's favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
248 (1986). A fact is "material" if, under the governing
substantive law, a dispute about the fact might affect the
outcome of the suit. <u>Id.</u> "In considering a motion for summary
judgment, a district court may not make credibility

---

[4] Plaintiff Trusted Transportation Solutions, LLC is a limited
liability company whose sole member is a citizen of New Jersey.
Defendant Guarantee Insurance Company is a corporation
incorporated in and with its principal place of business in
Florida. Defendant Patriot Underwriters, Inc., is a corporation
incorporated in Delaware with its principal place of business in
Florida. Defendant Douglas Cook is a citizen of Pennsylvania.
Defendant Brown & Brown of New Jersey, LLC is a limited
liability company whose sole member is a corporation
incorporated in and with its principal place of business in
Florida. Defendant John F. Corbett is a citizen of Delaware.

determinations or engage in any weighing of the evidence;
instead, the non-moving party's evidence 'is to be believed and
all justifiable inferences are to be drawn in his favor.'"
Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)
(quoting Anderson, 477 U.S. at 255).

Initially, the moving party bears the burden of
demonstrating the absence of a genuine issue of material fact.
Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment
always bears the initial responsibility of informing the
district court of the basis for its motion, and identifying
those portions of 'the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any,' which it believes demonstrate the absence
of a genuine issue of material fact."); see Singletary v. Pa.
Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although
the initial burden is on the summary judgment movant to show the
absence of a genuine issue of material fact, 'the burden on the
moving party may be discharged by "showing"—that is, pointing
out to the district court—that there is an absence of evidence
to support the nonmoving party's case' when the nonmoving party
bears the ultimate burden of proof." (quoting Celotex, 477 U.S.
at 325)).

Once the moving party has met this burden, the nonmoving

party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Celotex, 477 U.S. at 324.  A "party opposing summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading[s].'" Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).  For "the non-moving party[] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Cooper v. Sniezek, 418 F. App'x 56, 58 (3d Cir. 2011) (quoting Celotex, 477 U.S. at 322). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 257.

   **C.  The Parties' Motions for Summary Judgment**

   There are two key issues in the parties' motions.  First, both parties argue that they are entitled to summary judgment on the issue of liability.  Second, Defendants argue that, even assuming Defendants were negligent, they are entitled to summary judgment because Plaintiff has no cognizable damages.  The Court will address these arguments in turn.

      **1.  Were Defendants Negligent?**

   "Without question, insurance brokers and agents owe a

fiduciary duty of care to insureds" under New Jersey law.

President v. Jenkins, 814 A.2d 1173, 1185 (N.J. Super. Ct. App.

Div. 2003), aff'd in part and rev'd in part, 180 N.J. 550

(2004).  The New Jersey Supreme Court has held:

> One who holds himself out to the public as an
> insurance broker is required to have the degree of
> skill and knowledge requisite to the calling. When
> engaged by a member of the public to obtain insurance,
> the law holds him to the exercise of good faith and
> reasonable skill, care and diligence in the execution
> of the commission. He is expected to possess
> reasonable knowledge of the types of policies, their
> different terms, and the coverage available in the
> area in which his principal seeks to be protected. If
> he neglects to procure the insurance or if the policy
> is void or materially deficient or does not provide
> the coverage he undertook to supply, because of his
> failure to exercise the requisite skill or diligence,
> he becomes liable to his principal for the loss
> sustained thereby.

Rider v. Lynch, 42 N.J. 465, 476 (1964).  In other words, there

are two requirements for a finding of broker negligence in New

Jersey.  First, the broker must have "fail[ed] to exercise the

requisite skill or diligence" in obtaining coverage for the

client.  See id.  Second, because of that failure, one of the

following conditions must exist: (1) the broker "neglect[ed] to

procure the insurance," (2) "the policy is void," (3) "the

policy is 'materially deficient,' or (4) the policy 'does not

provide the coverage [the broker] undertook to supply.'"

President, 814 A.2d at 1185 (quoting Rider, 42 N.J. at 476).

There is a genuine issue of material fact as to the first

requirement.  Plaintiff claims that Defendants failed to
exercise the requisite skill or diligence in obtaining coverage
for Plaintiff for various reasons.  Plaintiff, properly citing
to the relevant evidentiary documents, alleges in support of
this point that:

- Defendant Corbett stated that the Guarantee policy would
  utilize a "universal rate" to determine the premiums, when
  in fact it did not;

- Defendant Corbett assured Plaintiff that the Loss Fund
  would roll over, when in fact it did not;

- Defendant Corbett assured Plaintiff that only costs related
  to indemnity costs, medical expenses, and attorneys' fees
  would come out of the Loss Fund, when in fact other
  expenses came out of the Loss Fund as well; and

- Defendant Corbett assured Plaintiff that the Loss Fund
  would be segregated from Guarantee's and Patriot's other
  funds, when in fact it was not.

Plaintiff asserts that the above discrepancies indicated
Defendants' failure to adequately exercise the requisite skill
and diligence in procuring the policy because they illustrate
that Defendants at best had inadequate knowledge about the
policy and at worst actively mischaracterized the policy to
Plaintiff.

Defendants contest each of the above allegations.  Also
properly citing to the relevant evidentiary documents, they
contend that:

- Defendants only utilized the "universal rate" as an
  estimation tool and never expressed to Plaintiff that the
  rate would in fact be universal;

- Defendants did not tell Plaintiff that the Loss Fund would
  roll over;

- Defendants made clear to Plaintiff that more than just
  indemnity costs, medical expenses, and attorneys' fees
  would be paid out of the Loss Fund;

- Defendants did not specify that the Loss Fund would be
  segregated; and

- Defendants provided to Plaintiff all the necessary
  paperwork, which adequately described the policy's actual
  terms.

In short, the above illustrates the fact that genuine
issues of material fact exist with respect to whether Plaintiff
can make out the first element of a broker negligence claim.  In
fact their factual positions seem diametrically opposed.  As to
Defendants' Motion for Summary Judgment, considering the
evidence in the light most favorable to nonmoving Plaintiff, a
reasonable jury could find that Defendants failed to exercise

the requisite skill or diligence in procuring Plaintiff's insurance policy. That would mean that Plaintiff satisfied the first element of broker negligence and that Defendants could not be entitled to summary judgment on that basis. Conversely, with respect to Plaintiff's Cross-Motion for Summary Judgment, considering the evidence in the light most favorable to nonmoving Defendants, a reasonable jury could find that Defendants did exercise the requisite skill or diligence in procuring Plaintiff's insurance policy. That would mean that Plaintiff failed to satisfy the first element of broker negligence and that Plaintiff could not be entitled to summary judgment on that basis. In other words, both Plaintiff and Defendants have presented sufficient evidence to allow a reasonable jury to find in their favor as to whether the first requirement for broker negligence has been met in this case. As such, summary judgment is not appropriate as to either party on that basis.

The next potential basis for summary judgment is the second element for broker negligence: whether one of the four above-mentioned circumstances existed as a result of Defendants' failure to exercise the requisite skill or diligence in procuring Plaintiff's insurance policy. Defendants argue that only the fourth option could potentially apply to this case,

while Plaintiff does not specifically address which, if any,
applies.[5]  The Court agrees with Defendants: it is indisputable
that Defendants procured the insurance for Plaintiff, the policy
was not void, and the policy was not materially deficient.
Therefore, the remaining issue is whether the policy provides
the coverage that Defendant undertook to supply.

Here, there is also a genuine issue of material fact.  In
essence, the dispute is over what instructions Plaintiff gave
Defendants.  Defendants argue that Plaintiff's instructions were
simple: Plaintiff wanted to get out of the state-run assigned
risk pool.  All parties agree that Defendants delivered on that
instruction with the policy they provided, which was outside of
the pool.

Plaintiff argues that its instructions were more nuanced
and that Defendants failed to satisfy them.  Plaintiff claims to
have asked for "the best deal [it] could get," with the goal of
"find[ing] the best insurance that makes the most sense for
[Plaintiff]."  (Docket Item 147-1 at 5.)  In its brief,
Plaintiff argues the interactions between the parties made it
clear that low costs were "paramount" to its goals.  (Id.)  It
is undisputed that the policy was not the least expensive option

---

[5] The Court notes, however, that Plaintiff's arguments are most
naturally applicable to the fourth option.

17

available, as remaining in the pool would have been less expensive.

Moreover, a reasonable jury could find that Plaintiff provided even more specific instructions during the March 31, 2015 meeting discussed above. Plaintiff contends that it asked pointed questions about various elements of the Guarantee policy, at least one of which Plaintiff claims was a "huge selling point." Plaintiff alleges that Defendants answers to those questions did not accurately describe the Guarantee policy.

Defendants deny that certain aspects of that conversation even occurred, and further deny that Defendants made any promises that did not turn out to accurately reflect the policy. Based on what the jury believes, it could find that Plaintiff's questions amounted to a request for the policy that it alleges it thought it was getting. If the jury believes Plaintiff's evidence, then it could find that Defendants failed to procure the policy it set out to procure based on the March 31, 2015 meeting. But if a jury believes Defendants' evidence, then it could reasonably find that Defendant did in fact deliver on what it was supposed to deliver.

The above arguments illustrate different possible scenarios with respect to the instructions given to Defendants. A

reasonable jury could interpret the above evidence in any number of ways, some of which would lead to Plaintiff's success and some of which to Defendants' success.  With respect to Defendants' Motion for Summary Judgment, a reasonable jury, making all reasonable inferences in favor of nonmoving Plaintiff, could find that Defendant did not provide the coverage they undertook to supply.  This would mean that Plaintiff satisfied the second element for broker negligence and that Defendants would not be entitled to summary judgment on that basis.

Conversely, with respect to Plaintiff's Cross-Motion for Summary Judgment, a reasonable jury, making all reasonable inferences in favor of nonmoving Defendant, could find that Defendant did provide the coverage they undertook to supply. This would mean that Plaintiff failed to satisfy the second element for broker negligence and that Plaintiff would not be entitled to summary judgment on that basis.

In short, as with the first element for broker negligence, both Plaintiff and Defendants have presented sufficient evidence to allow a reasonable jury to find in their favor as to whether the second requirement for broker negligence has been met in this case.  As such, summary judgment is not appropriate as to either party on that basis.

## 2. Assuming Defendants Were Negligent, Is Plaintiff Entitled to Damages?

Defendants also argue that they are entitled to summary judgment because, even assuming that Defendants were negligent, Plaintiff cannot recover damages. Plaintiffs disagree, arguing that Defendants caused hundreds of thousands of dollars in damages by breaching their duty to Plaintiff. In particular, Plaintiff seeks the following damages: (1) $123,329.90 for the costs paid from the Loss Fund beyond indemnity, medical, and legal fees—the only fees that were supposed to come out of the Loss Fund, according to Defendants' alleged assurances; (2) $45,231.39 for the outstanding amount in the Loss Fund, which was not segregated as Plaintiff alleges Defendants said it would be; (3) $61,666.88 for the difference between what Plaintiff paid in premiums and what it would have paid had the "universal rate" applied; (4) $45,465.00 for the commissions that were paid to Defendants; and (5) punitive damages. (See Docket Item 147-1 at 26-29; Docket Item 138-1 at 14-15.)

As Rider held, a negligent broker is "liable to his principal for the loss sustained thereby." Rider, 42 N.J. at 476. If a jury finds that Defendants were negligent because of their alleged misrepresentations or misunderstandings about the policy in question, and specifically because of the alleged misrepresentations about the Loss Fund and the "universal rate,"

20

then each of the first three figures demanded above could be deemed damages under <u>Rider</u>.  In other words, if a jury finds Defendants were negligent, the "loss sustained thereby" could include (1) $123,329.90 for the costs paid from the Loss Fund beyond indemnity, medical, and legal fees—the only fees that were supposed to come out of the Loss Fund, according to Defendants' alleged assurances; (2) $45,231.39 for the outstanding amount in the Loss Fund, which was not segregated as Plaintiff alleges Defendants said it would be; and (3) $61,666.88 for the difference between what Plaintiff paid in premiums and what it would have paid had the "universal rate" applied.

Defendants arguments on those three sums are unavailing. First, as to the allegedly excess costs paid from the Loss Fund, Defendants argue that Plaintiff actually saved money because of the "bill review services," which saved Plaintiff from overpaying on certain bills, even though the insurer kept 40% of those savings.  Defendants further argue that Plaintiff cannot quantify its alleged damages related to that service.  Plaintiff rebuts that Defendants' argument mistakenly relies on the assumption that Plaintiff is only complaining about the "bill review services," when in fact it claims damages resulting from all expenses beyond indemnity, medical, and attorneys' fees.

Plaintiff bases this argument on its allegation that Defendants misrepresented what expenses would come out of the Loss Fund, outlined above.  If a jury finds that Defendants were negligent, then these expenses out of the Loss Fund could be damages.

Defendants next argue that Plaintiff cannot recover from them the $45,231.39 that remains in the Loss Fund.  Again, if a jury finds that Defendants were negligent in stating that the Loss Fund would be segregated — in which case Plaintiffs may have already been able to recover the funds — then the remaining amount could be damages as well.

Finally, Defendants argue that, because no policy with a "universal rate" exists, Plaintiff could not suffer damages for receiving a policy without such a rate.  Whether that type of policy actually exists is immaterial if a jury finds that Defendants negligently led Plaintiff to believe that one did exist in the form of the Guarantee policy.  Defendants also argue that Plaintiff fails to calculate the damages resulting from the "universal rate" issue.  But, again, if a jury believes Plaintiff's version of events, then the difference between the actual cost of the premiums and what the premiums would have been based on a $5.32 per $100 of payroll rate is an appropriate calculation.  Therefore, given that this aspect of Defendants' Motion for Summary Judgment operates on the assumption that a

jury would find them to have been negligent and the first three

damages Plaintiff claims all stem from that negligence, summary

judgment based on lack of damages is inappropriate in this case.[6]

## CONCLUSION

For the reasons expressed above, the Court will deny both

Defendants' Motion for Summary Judgment (Docket Item 138) and

Plaintiff's Cross-Motion for Summary Judgment (Docket Item 147).

An appropriate Order will be entered.


Date:  September 27th, 2019        s/Noel L. Hillman
At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.

---

[6] Defendants also raise arguments that Plaintiff is not entitled
to disgorgement and punitive damages here.  Having found that
Plaintiff could recover damages on other grounds, the Court need
not, and does not, consider Defendants' arguments about
disgorgement and punitive damages for the purposes of summary
judgment.